Slip Op. 14-116

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AMERICAN TUBULAR PRODUCTS, LLC, and JIANGSU CHENGDE STEEL TUBE SHARE CO., LTD., <br><br>                               Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br>                               Defendant, <br><br> and <br><br> UNITED STATES STEEL CORPORATION, TMK IPSCO, WHEATLAND TUBE COMPANY, and V&M STAR L.P., <br><br>                         Defendant-Intervenors. | Before: Richard W. Goldberg, Senior Judge <br> Court No. 13-00029 <br><br> **PUBLIC VERSION** |

## OPINION AND ORDER

[The court remands the final results of an administrative review of an antidumping duty order on oil country tubular goods from the People's Republic of China.]

Dated:  September 26, 2014

*Donald B. Cameron*, *Julie C. Mendoza*, *R. Will Planert*, *Brady W. Mills*, *Mary S. Hodgins*, and *Sarah S. Sprinkle*, Morris, Manning & Martin LLP, of Washington, DC, for plaintiffs.

*L. Misha Preheim*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant.  With him on the brief were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director.  Of counsel on the brief was *Whitney Rolig*, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

*Robert E. Lighthizer*, *Jeffrey D. Gerrish*, *Ellen J. Schneider*, and *Luke A. Meisner*, Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, DC, for defendant-intervenor United States Steel Corporation.

*Roger B. Schagrin* and *John W. Bohn*, Schagrin Associates, of Washington, DC, for defendant-intervenors TMK IPSCO, Wheatland Tube Company, and V&M Star L.P.

Goldberg, Senior Judge:  In this case, Jiangsu Chengde Steel Tube Share Co., Ltd. ("Chengde") and American Tubular Products, LLC ("ATP") (collectively, "Plaintiffs") challenge the results of the 2010−2011 review of an antidumping duty order on oil country tubular goods ("OCTG") from the People's Republic of China.  *See Certain Oil Country Tubular Goods from the People's Republic of China*, 77 Fed. Reg. 74,644 (Dep't Commerce Dec. 17, 2012) (final admin. review) ("*Final Results*") and accompanying Issues & Decision Mem. ("*I&D Memo*"), as amended by *Certain Oil Country Tubular Goods from the People's Republic of China*, 78 Fed. Reg. 9033 (Dep't Commerce Feb. 7, 2013) (amended admin. review).[1]

Plaintiffs argue that the Department of Commerce ("Commerce" or "the agency") made five incorrect decisions in the *Final Results*.  These decisions include (1) Commerce's choice of surrogate values for steel billet, one of the inputs into Chengde's OCTG, (2) the decision to deny Chengde a normal value offset for steel scrap produced and sold during the review period, (3) Commerce's surrogate value for ocean freight, (4) Commerce's surrogate value for inland freight, and (5) the decision to classify thread protectors as a direct input into OCTG and not as a packing material.  *See generally I&D Memo*.  The court remands the first of these decisions for reevaluation but sustains the agency's reasoning on the remaining four topics.

## GENERAL BACKGROUND

The U.S. government levies fees on foreign goods sold in the United States for less than their fair value, so long as those sales harm or threaten U.S. domestic industry.  *See* 19 U.S.C. § 1673 (2006).  Commerce begins calculating these fees—called antidumping duties—by

---

[1] Chengde is a producer and exporter of OCTG.  ATP is an importer of OCTG into the United States.  *See* Summons, ECF No. 1.

subtracting a foreign product's "export price," or the product's price in the United States, from its "normal value," or the product's price in the exporting country.  *See id.*  The difference is the goods' "dumping margin."  *Id.* § 1677(35)(A).

How Commerce calculates normal value ("NV") depends on whether the exporter makes its wares in a market economy ("ME") or a nonmarket economy ("NME").  For goods made in ME countries, Commerce generally uses the goods' price in the exporting country as NV.  *See id.* § 1677b(a)(1)(B)(i).  For NME exports, however, the calculus is not so simple.  The law presumes that government action distorts both the price of goods made in NME countries and the cost of inputs used to make those goods.  *See Blue Field (Sichuan) Food Indus. Co. v. United States*, 37 CIT __, __, 949 F. Supp. 2d 1311, 1317 (2013).  To calculate NV for goods made in NME countries, then, the agency assigns each of the goods' inputs an artificial market price or surrogate value.  *See* 19 U.S.C. § 1677b(c)(1).  Once Commerce finds the total cost of inputs used, it adds an amount for general expenses, profit, containers, and other costs.  *Id.*  The sum of this equation is the goods' NV.

Naturally, Commerce cannot pack the NV formula with whatever data it wishes.  Rather, the law requires that only "the best available information" be used for surrogate values.  *Id.* Ordinarily, Commerce selects surrogate values from ME countries that produce significant amounts of subject merchandise and that are economically comparable to the exporting country. *Id.* § 1677b(c)(4).  Commerce also prefers data that are "product-specific, representative of a broad-market average, publicly available, contemporaneous with the [review period], and free of taxes and duties" for use as surrogates.  *I&D Memo* at cmt. 1.

To aid these calculations, the parties to a review—including foreign exporters and interested U.S. companies—may submit data.  Commerce generally requests data through

questionnaires at the outset of a review.  *See* 19 C.F.R. § 351.221(b)(2) (2014).  Later, if the

agency finds it needs more information to complete its work, it may send out supplemental

questionnaires.  *See id.* § 351.301(a).  Commerce then analyzes the data on the administrative

record and publishes preliminary results, to which the parties respond with case briefs and

rebuttals.  *See id.* §§ 351.221(b)(4)(ii), 351.309(c)(1)(ii).  Final results are issued after

Commerce closes the record to additional information and argument.  *See id.* § 351.221(b)(5).

        In the present review, Commerce sought to determine dumping margins for OCTG from

the People's Republic of China, an NME country.  The agency made a number of preliminary

decisions that Plaintiffs contested in their case briefs.  These included (1) Commerce's choice of

surrogate values for steel billet, (2) the decision to deny Chengde an NV offset for steel scrap

produced and sold during the review period, (3) Commerce's surrogate value for ocean freight,

(4) Commerce's surrogate value for inland freight, and (5) the decision to classify thread

protectors as a direct input into the OCTG and not as a packing material.  *See I&D Memo* at

cmts. 1−2, 7−9.  Commerce reaffirmed these decisions in the *Final Results*, and Chengde

appealed on January 16, 2013.  *See* Summons, ECF No. 1.

## JURISDICTION AND STANDARD OF REVIEW

        The court has jurisdiction to hear this appeal under 28 U.S.C. § 1581(c).  The court will

uphold the agency's decisions unless those decisions are "unsupported by substantial evidence

on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

        In light of these standards, the court must remand one issue to Commerce: the choice of

surrogate values for steel billet.  The court sustains the agency on all other counts, including

Commerce's denial of an offset for steel scrap, the choice of surrogate values for ocean and

inland freight, and the decision to classify thread protectors as direct inputs.

## I.      The Surrogate Values for Steel Billet Were Not Based in Substantial Evidence

To begin, the court considers Plaintiffs' claims regarding steel billet, the main ingredient

in Chengde's OCTG.  Plaintiffs allege that the agency made three wrong decisions when

assigning surrogate values for billet: (1) Commerce incorrectly concluded that Chengde used

alloy steel billets—not carbon steel billets—to produce most of the OCTG sold during the review

period, (2) the agency selected a surrogate value for carbon steel billet that was not specific to

the billet Chengde used, and (3) Commerce chose a surrogate value for high-carbon steel billet

that was aberrantly expensive.  Pls.' Mot. for J. on Agency R. 12−23, ECF No. 39-1 ("Pls.' Br.").

The court finds the first of these decisions was not based in substantial evidence, because

Commerce failed to explain why documents proving the chemical makeup of some of Chengde's

billet could not also prove the makeup of the remaining billet.  The court also remands the third

decision at the agency's request.

### A.  Background

Before tackling the merits, the court must explain how Commerce decided what fraction

of Chengde's billet was alloy or carbon steel.  The administrative history is complex, so the court

provides tables below to summarize the data relevant to the agency's decision making.

At the outset of the review, Commerce asked Chengde to identify the factors of

production it used to produce subject OCTG.  Chengde responded with proposed surrogate

values for its inputs, including a surrogate value for steel billet.  Chengde Resp. to Sections C&D

Questionnaire ("C&D Resp.") at Ex. D-5, CD IV 19−23 (Nov. 17, 2011), ECF No. 46-3 (May

24, 2013).  The surrogate Chengde offered was U.S. Harmonized Tariff Schedule ("HTS")

7224.90.0075, a subheading covering semifinished alloy steel products. *Id.* Chengde also

furnished inventory out slips and a monthly steel billet consumption statement to document its

billet use. *Id.* at Ex. R-2.

In December 2011, Commerce issued its first supplemental questionnaire. First

Supplemental Questionnaire ("First Supp. Q."), CD IV 30 (Dec. 12, 2011), ECF No. 46-3 (May

24, 2013). The questionnaire asked Chengde to state the chemical makeup of its inputs and to

provide supporting documents, including sample purchase contracts, invoices, packing lists, and

certificates of assay. *Id.* at 6. Chengde answered with a technical description of its inputs and

sales contracts from a billet supplier. First Supplemental Resp. ("First Supp. Resp.") at Exs. S1-

4, S1-5, CD IV 36−43 (Jan. 11, 2012), ECF No. 46-3 (May 24, 2013). These data outlined the

American Society of Mechanical Engineers ("ASME") specifications for Chengde's billet:

SA106C, 28Mn2, and SA210C. These data did not indicate whether Chengde's billet was

carbon or alloy steel, however.[2]

Commerce then sent a second supplemental questionnaire asking Chengde to "submit

sample product quality certificates and mill test reports/certificates for all control numbers

('CONNUMS') sold during the [review period]." Second Supplemental Questionnaire ("Second

Supp. Q.") at 4, CD IV 47 (Feb. 15, 2012), ECF No. 46-3 (May 24, 2013). In reply, Chengde

sent its U.S. purchase contracts and the first pages of ten mill certificates, which listed the

chemical properties of OCTG sold during the review period. Second Supplemental Resp.

("Second Supp. Resp.") at Exs. S2-13, S2-14, CD IV 50−58 (Mar. 15, 2012), ECF No. 46-3

(May 24, 2013). Each page from the mill certificates corresponded to a discrete U.S. sales

---

[2] In its Section A response, Chengde furnished a brochure detailing the chemical properties of ASME SA210C steel. Chengde Resp. to Section A Questionnaire at Ex. A-19, CD IV 14−18 (Oct. 20, 2011), ECF No. 46-3 (May 24, 2013). Commerce found the brochure was inconclusive regarding whether SA210C is alloy or carbon steel. *See I&D Memo* at cmt. 1.

contract for a single type of OCTG, but only part of the total OCTG sold was sampled.  All

OCTG specifically tested in the mill certificates was made of carbon steel.[3]

     Table 1 shows the amount of OCTG sampled and sold under each U.S. sales contract

during the review period.  Henceforth, the court refers to the [[        ]] percent of OCTG

specifically tested in the certificates as the "sampled OCTG."  The remaining [[        ]] percent

of OCTG sold is referred to as the "unsampled OCTG."

| Table 1: OCTG Sampled in Mill Certificates[4] | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| U.S. Sale Number | Contract Number | Model | CONNUM | Weight Sampled in Mill Certificate (MT) | Total Weight Sold (MT) | Percent Sampled (%) |
| 1 | [[    ]] | [[  ]] | 1 | [[    ]] | [[    ]] | [[    ]] |
| 2 | [[    ]] | [[  ]] | 2 | [[    ]] | [[    ]] | [[    ]] |
| 3 | [[    ]] | [[  ]] | 3 | [[    ]] | [[    ]] | [[    ]] |
| 4 | [[    ]] | [[  ]] | 4 | [[    ]] | [[    ]] | [[    ]] |
| 5 | [[    ]] | [[  ]] | 5 | [[    ]] | [[    ]] | [[    ]] |
| 6−7 | [[    ]] | [[  ]] | 6 | [[    ]] | [[    ]] | [[    ]] |
| 8−10 | [[    ]] | [[  ]] | 5 | [[    ]] | [[    ]] | [[    ]] |
| 11−13 | [[    ]] | [[  ]] | 6 | [[    ]] | [[    ]] | [[    ]] |
| 14 | [[    ]] | [[  ]] | 7 | Not sampled | [[    ]] | 0.00 |
| 15 | [[    ]] | [[  ]] | 8 | Not sampled | [[    ]] | 0.00 |
| 16 | [[    ]] | [[  ]] | 9 | Not sampled | [[    ]] | 0.00 |
| 17 | [[    ]] | [[  ]] | 6 | [[    ]] | [[    ]] | [[    ]] |
| 18−19 | [[    ]] | [[  ]] | 6 | [[    ]] | [[    ]] | [[    ]] |
| TOTAL | | | | [[    ]] | [[    ]] | [[    ]] |

---

[3] Chengde also sent the agency a few more billet sales contracts. Second Supp. Resp. at Ex. S2-15.

[4] Table 1 is based on Attachment A to Defendant-Intervenor United States Steel Corporation's brief.  Mem. in Opp'n to Pls.' Mot. for J. on Agency R., ECF No. 72.  The data in the chart come from Chengde's mill certificates, its U.S. sales contracts, and a sales database from the third supplemental response.  *See* Second Supp. Resp. at Exs. S2-13, S2-14; Third Supplemental Resp. at Ex. S3-12, CD IV 60−65 (May 2, 2012), ECF No. 46-3 (May 24, 2013).  Furthermore, each numeral in the chart's CONNUM column corresponds to a unique control number or product identifier, as outlined in Attachment A to U.S. Steel's brief.

After issuing yet another questionnaire, Commerce published its preliminary results. *Certain Oil Country Tubular Goods from the People's Republic of China*, 77 Fed. Reg. 34,013 (Dep't Commerce June 8, 2012) (prelim. admin. review) ("*Preliminary Results*").  As a surrogate value for steel billet, Commerce used Indonesian Global Trade Atlas ("GTA") import data for alloy steel.  Prelim. Factor Valuation Mem. ("Prelim. Factor Mem.") at Attach. 1, PD II 114 (May 30, 2012), ECF No. 46-2 (May 24, 2013).  Apparently, Commerce had either ignored or rejected any data hinting that Chengde's OCTG was made of carbon steel.

Between the *Preliminary Results* and the case briefs, the parties submitted additional data.  First, in an administrative protective order ("APO") application, ATP sent Commerce a Customs and Border Protection ("CBP") entry summary that classified OCTG sold under contract [[      ]] as carbon steel.  APO Appl. at Attach. 1, CD IV 69 (Jul. 16, 2012), ECF No. 46-3 (May 24, 2013).  The United States Steel Corporation ("U.S. Steel"), a Defendant-Intervenor on appeal, also submitted rebuttal data including website screenshots.  U.S. Steel Surrogate Value Rebuttal at Exs. J−K, PD II 130 (July 16, 2012), ECF No. 46-2 (May 24, 2013).  The screenshots showed that Chengde's model P110 steel tubes—the type of OCTG sold under contracts [[             ]]—were made of alloy steel.

Plaintiffs then submitted case briefs contesting Commerce's surrogate value for steel billet.  *See* ATP Revised Case Br. ("ATP Case Br.") at 3−13, CD IV 73 (Aug. 3, 2012), ECF No. 46-3 (May 24, 2013); Chengde Revised Case Br. ("Chengde Case Br.") at 1−9, PD II 144 (Aug. 2, 2012), ECF No. 46-2 (May 24, 2013).  In both of those briefs, Plaintiffs argued that Chengde made a mistake in its initial response, accidentally classifying its billet as alloy steel instead of carbon steel.  To correct this error, they asked Commerce to value billet under HTS 7207.19, a subheading covering semifinished products of iron or nonalloy steel.  Chengde Case Br. 1−2; *see*

*also* ATP Case Br. 3−4.  In Plaintiffs' view, Chengde's mill certificates proved that all the

OCTG sold during the review period was carbon steel.  Plaintiffs also argued that the Indonesian

GTA data were unfit as surrogate values for carbon steel billet.  *See* Chengde Case Br. 3−9.  In

their estimation, prices under Indonesian HTS 7207.19 seemed aberrantly high and not specific

to Chengde's inputs, especially when judged against alternative Ukrainian data.  *Id.*

At the end of the administrative marathon, Commerce concluded that most of Chengde's

billet was made of alloy steel.  *See* Final Analysis Mem. at 2, CD IV 80 (Dec. 5, 2012), ECF No.

46-3 (May 24, 2013).  In support, the agency relied on Chengde's initial questionnaire response,

which claimed that all its billet inputs were alloy steel.  *I&D Memo* at cmt. 1.  Commerce also

cited the billet consumption statement, inventory out slips, and website data to prove that the

preponderance of Chengde's billet was alloy steel.  *Id.*

Even so, Commerce held that part of Chengde's billet was carbon steel for two reasons.

First, Commerce found that finished OCTG has the same chemical properties as raw billet.  *Id.*

No one disputes this finding on appeal.  Second, Commerce said Chengde's mill certificates

proved that all sampled OCTG was made of carbon steel.  *Id.*  The agency thus concluded that

[[   ]] percent of Chengde's billet was made of carbon steel.  Final Analysis Mem. at 2.

Commerce also adopted the Indonesian GTA data to value carbon steel billet over Plaintiffs'

objections.  *I&D Memo* at cmt. 1.

Table 2 summarizes record data respecting the chemical makeup of Chengde's billet.

| **Table 2: Record Evidence Regarding Steel Billet** |
|---|---|---|---|---|
| No. | Data Name | Source | Date Submitted | Description |
| 1 | Chengde Company Brochure | Section A Resp., Ex. A-19 | Oct. 20, 2011 | Describes the chemical properties of SA210C steel. |
| 2 | Surrogate Value Spreadsheet | C&D Resp., Ex. D-5 | Nov. 17, 2011 | Classifies billet under HTS 7224.90.0075 (alloy steel items) and specifications SA106C, 28Mn2, and SA210C. |
| 3 | Steel Billet Consumption Statement | C&D Resp., Ex. R-2 | Nov. 17, 2011 | Shows that Chengde consumed steel billet of specifications SA210C, 28Mn2, and others during the review period. |
| 4 | Inventory-Out Slips | C&D Resp., Ex. R-2 | Nov. 17, 2011 | Shows that Chengde consumed steel billet of specifications SA210C, 28Mn2, and others during the review period. |
| 5 | Description of Factors of Production | First Supp. Resp., Ex. S1-4 (S1-15) | Jan. 11, 2012 | Classifies billet under specifications SA106C, 28Mn2, and SA210C. |
| 6 | Billet Sales Contracts | First Supp. Resp., Ex. S1-4 (S1-15) | Jan. 11, 2012 | Shows billet of specifications [[    ]] purchased in November 2009 and March 2010. |
| 7 | Mill Test Certificates | Second Supp. Resp., Ex. S2-13 | Mar. 15, 2012 | Shows sample chemical data for OCTG sold under contracts [[    ]]. |
| 8 | Billet Sales Contracts | Second Supp. Resp., Ex. S2-15 | Mar. 15, 2012 | Shows billet of specification SA210C and SA106C purchased during the review period. |
| 9 | CBP Entry Summary | APO Appl., Attach. 1 | July 16, 2012 | Classifies goods shipped in contract [[    ]] under HTS 7304.29.2030, or seamless tube of iron or nonalloy steel. |
| 10 | Chengde Website | U.S. Steel Surrogate Value Rebuttal Data, Exs. J–K | July 16, 2012 | Shows model P110 steel tube made of alloy steel; calls Chengde's J/K55, L80, and P110 tubing "alloy steel pipe." |

**B.  The Decision to Value Most of Chengde's Billet as Alloy Steel Was Unsubstantiated in Evidence**

Plaintiffs first challenge the decision to value most of Chengde's billet as alloy steel. Pls.' Br. 12−18.  In their view, Chengde's mill certificates proved that not only some, but all the billet consumed during the review period was carbon steel.  Commerce, by contrast, argues that any OCTG not specifically sampled in the mill certificates was alloy steel.  Def.'s Resp. to Pls.' Rule 56.2 Mot. for J. on Agency R. 13−18, ECF No. 66 ("Gov't Br.").  But neither argument is entirely correct.

On one hand, the record does not support Plaintiffs' claim that all billet consumed to make OCTG was carbon steel.  That is because Chengde furnished no mill certificates to prove that the goods sold under contracts [[                    ]] were made of carbon steel.  *See supra* Table 1 nos. 14−15.  On the contrary, a website screenshot showed that model P110 tubing—the item sold in these contracts—contained 0.8 to 1.10 percent chromium by weight.  *See supra* Table 2 no. 10 at Ex. J; *see also* Mem. in Opp'n to Pls.' Mot. for J. on Agency R. 14 n.13, ECF No. 72 ("U.S. Steel Br.").  Normal steel becomes alloy steel if it contains more than 0.3 percent chromium, and Chengde's P110 exceeded this threshold.  *See* HTS ch. 72 n.1(f).  Commerce thus had a simple choice to make.  It could rely on Chengde's unsupported suggestion that the billet used to manufacture P110 tubing was carbon steel, or it could credit firm record data showing that P110 tubing is made of alloy steel.  The agency reasonably chose the latter course in the *Final Results*.

On the other hand, Commerce was too quick to conclude that all unsampled OCTG was made of alloy steel billet.  Although it reasonably relied on Chengde's mill certificates to find the sampled OCTG was carbon steel, Commerce never explained why unsampled OCTG sold in the same contracts as sampled OCTG was not also carbon steel.  *See I&D Memo* at cmt. 1; *supra*

Table 2 no. 7.  Plaintiffs describe how the mill certificates tend to prove the unsampled OCTG

was made of carbon steel:

> Chengde provided sample mill test certificates for 16 of the 19 U.S. sales made
> during the period of review.  Each sale consisted of only one product.  Those 16
> U.S. sales accounted for 10 of the 13 purchase contracts and six of the nine
> specific OCTG products (control numbers, or "CONNUMs") applicable to the
> [review period].

Pls.' Br. 12 (internal citations omitted).  Furthermore, "[a]ll of those mill certificates indicated

the products were carbon steel."  *Id.*  Taken together, this evidence suggests that OCTG not

specifically sampled—yet commercially identical to sampled OCTG—was made of carbon steel.

In fact, the agency itself suggested that testing a fraction of Chengde's products could prove the

chemical makeup of unsampled OCTG.  First Supp. Q. 6 (requesting certificates of assay for

inputs, but only for first purchase during review period); Second Supp. Q. 4 (requesting sample

product quality certificates for each type of OCTG sold).  Nevertheless, the *Final Results* treated

OCTG sampled in the mill certificates as if it were unrepresentative of the chemical makeup of

unsampled OCTG.  The agency never explained why this might be the case.  *See I&D Memo* at

cmt. 1.  This omission rendered Commerce's decision unsubstantiated in evidence.

    Commerce also failed to consider the CBP entry summary submitted with ATP's APO

application.  *See supra* Table 2 no. 9.  That document classified OCTG sold in contract [[      ]]

under HTS 7304.29.2030, a subheading covering seamless tube of iron or nonalloy (i.e., carbon)

steel.  It was unreasonable for Commerce to ignore this evidence yet conclude that the billet used

to make these goods was alloy steel.

    Furthermore, the agency used flawed data to prove that most of the unsampled OCTG

was alloy steel.  *See I&D Memo* at cmt. 1.  Consider, for example, Chengde's inventory out slips

and billet consumption statement.  *See supra* Table 2 no. 3−4.  Although these data imply that

Chengde consumed alloy billet to make tubes generally, the documents do not reveal whether

Chengde used alloy billets to make the OCTG now under review.  *See* Pls.' Br. 17.

Nor do the websites clearly show that all the unsampled OCTG was alloy steel.

Admittedly, Chengde's online advertising calls grade J/K55, L80, and P110 tubing "alloy steel

pipe."  *See supra* Table 2 no. 10 Ex. K.  The websites also show that certain types of pipe contain

alloy metals.  *See id.* at Ex. J.  But these online data may not describe subject goods.  One

website's entry for L80 pipe, for instance, describes a product that does not fall under the OCTG

antidumping order.  *See* Pls.' Br. 16 (noting website says L80 pipe contains 13 percent

chromium); *Certain Oil Country Tubular Goods from the People's Republic of China*, 75 Fed.

Reg. 28,551, 28,553 (Dep't Commerce May 21, 2010) (amended final determ.) ("*OCTG Order*")

(excluding OCTG with 10.5 percent or more chromium by weight from order).  It was

unreasonable for Commerce to rely on these data—yet disregard the mill certificates and entry

summary—to decide that the unsampled OCTG was alloy steel.

Citing *Timken v. United States*, 434 F.3d 1345 (Fed. Cir. 2006), U.S. Steel counters that

Chengde failed to disprove its initial position, i.e., that the billet was alloy steel.  U.S. Steel Br.

16−17.  But this argument incorrectly shifts scrutiny from Commerce to the Plaintiffs.  In

*Timken*, a respondent used dubious evidence to show that its home market sales were mislabeled,

and Commerce fairly explained why respondent's proof failed.  *See* 434 F.3d at 1349−50.  Here,

by contrast, the agency did not fully confront Chengde's arguments and data regarding carbon

steel billet.  Although Commerce found that Chengde's mill certificates were "a reliable basis on

which to determine the chemical composition" of sampled OCTG, the agency never told why

those data were not equally useful to prove the properties of unsampled OCTG.  *I&D Memo* at

cmt. 1.  *Timken* does not plug this hole in Commerce's reasoning.[5]

On remand, Commerce need not reconsider the chemical makeup of billet used to

manufacture the OCTG sold in contracts [[                         ]].  *See supra* Table 1 nos. 14−15.

Chengde offered no evidence that these goods were made of carbon steel, and the agency

reasonably found that this OCTG consisted of alloy billet.  Commerce must reevaluate the

chemical composition of OCTG sold in contracts [[

                         ]], however.  *See id.* at nos. 1−13, 17−19.  In

particular, the agency must explain whether Chengde's mill certificates prove the chemical

properties of OCTG not specifically tested in those certificates.  *See supra* Table 2 no. 7.  The

agency must also assess whether Chengde's entry summary proves that the OCTG in contract

[[     ]] was carbon steel.  *See supra* Table 1 no. 16; Table 2 no. 9.  Then Commerce must

recalculate the percentage of Chengde's billet that was alloy steel or carbon steel in accordance

with this analysis.

### C.  The Indonesian Surrogates Were Reasonably Specific to Chengde's Carbon Steel Billets

Plaintiffs next challenge Commerce's surrogate values for carbon steel billet, calling

them insufficiently specific to Chengde's actual inputs.  *See* Pls.' Br. 18−19.  In its review, the

---

[5] Defendant-Intervenors raise other arguments, but the court rejects them outright.  *See* U.S. Steel Br. 15 (claiming chemical composition of OCTG varied within single mill certificate); *id.* (claiming Chengde furnished mill certificate pages on "selective" basis); *id.* at 17−18 (noting Chengde drew its initial classification of alloy steel billet from investigation that also involved carbon steel billet).  Commerce used none of these arguments below, so the parties cannot try them on appeal.  *See SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943) ("[A]n administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained.").

The parties also debate whether the ASME specifications for Chengde's billet—SA210C, SA106C, and 28Mn2—reveal the chemical makeup of the input.  *See, e.g.*, Pls.' Br. 13.  The court finds no record data defining the chemical properties of SA106C and 28Mn2, however, and Chengde's company brochure shows SA210C can be either alloy or carbon steel.  *See supra* Table 2 no. 1.  The court thus agrees with Commerce that these data did not prove the type of billets Chengde used to make OCTG.  *See I&D Memo* at cmt. 1.

agency used Indonesian GTA data from HTS subheadings 7207.19 and 7207.20 to value high-

and low-carbon steel billet.  *I&D Memo* at cmt. 1.  Nevertheless, the record shows that six

Indonesian OCTG producers either made a different type of OCTG than Chengde, or used

semifinished steel pipe rather than raw billet during production.  *See* Pls.' Br. 18−19; Domestic

Interested Parties' Surrogate Country Comments at Ex. 1, PD II 51 (Dec. 19, 2011), ECF No. 46-

2 (May 24, 2013); U.S. Steel Surrogate Country Comments at Ex. A, PD II 55 (Jan. 6, 2012),

ECF No. 46-2 (May 24, 2013).  In Chengde's view, this proves that "the Indonesian import data

[do] not include any imports of the type of billets used for [Chengde's] OCTG production."  Pls.'

Br. 19.

     Doubtless, if a surrogate does not value an item similar to an exporter's input, this could

distort the exporter's dumping margin.  *See Blue Field*, 37 CIT at __, 949 F. Supp. 2d at 1328.

Yet Plaintiffs marshaled no concrete data to show that imports under Indonesian HTS 7207.19

and 7207.20 are different from the billet Chengde used to produce subject OCTG.  *See id.*

(holding exporter bears *de facto* burden to show surrogate not specific).  And Chengde's

inference—in essence, that Indonesia does not import carbon steel billet because domestic

OCTG manufacturers do not use it in their production—rests on an assumption that only OCTG

producers consume steel billet.  Chengde has not shored up this assumption with record

evidence.  As such, the court cannot hold that Commerce's carbon steel surrogates were not

specific to Chengde's inputs.[6]

---

[6] Plaintiffs also claim that HTS 7207.19 and 7207.20 are "basket" categories that cover products other than billets.  Reply Br. 10–11.  But Plaintiffs did not make this claim in their lead brief.  *See* Pls.' Br. 18–19.  Hence the argument was waived.  *See Novosteel SA v. United States*, 284 F.3d 1261, 1273−74 (Fed. Cir. 2002).

### D. On Remand, Commerce May Determine Whether the Indonesian Surrogate Data Were Aberrational

Finally, Plaintiffs argue that Commerce's surrogate for high-carbon steel billet was aberrantly high.  In their brief, Plaintiffs note that high-carbon steel billet prices on the London Metals Exchange were far lower than prices under Indonesian HTS 7207.20.  *See* Pls.' Br. 22. They also argue that Indonesian steel high-carbon prices seem too expensive when compared to low-carbon prices from the same country.  *Id.* at 19−20.  Thus Plaintiffs would use Ukrainian data to value carbon steel billet.  *See id.* at 21.  Defendant-Intervenors, by contrast, argue that Commerce's high-carbon steel billet surrogate was reasonable compared to similar data from comparable economies.  *See* U.S. Steel Br. 23−24; Mem. of Def.-Intervenors TMK IPSCO, Wheatland Tube Co., and V&M Star L.P. 9−10, ECF No. 66.[7]

Independent of these arguments, Commerce found on appeal that its surrogates for high- and low-carbon steel billet were unreliable.  This is so because the *I&D Memo* "analyzed the import values [for carbon steel billet] submitted by U.S. Steel, which differed from the import values Commerce actually used in calculating the *Final Results*."  Gov't Br. 19.  The agency requests a voluntary remand to determine "whether the surrogate value for carbon non-alloy steel billets was aberrational."  *Id.*

The law permits voluntary remand when the agency "believes that its original decision is incorrect on the merits and it wishes to change the result."  *SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001).  That is certainly the case here.  Given alleged flaws in the Indonesian values, and given the agency's desire to reconsider its choice, the court remands the

---

[7] Plaintiffs argued in their lead brief that Ukrainian HTS data with ten-digit breakouts were both more specific than the Indonesian data and not aberrational.  Pls.' Br. 19−22.  Yet pursuant to the court's order on Defendant's motion to strike, the ten-digit data were stricken from Plaintiffs' brief.  Opinion and Order, ECF No. 58 (Aug. 6, 2013).  Accordingly, the court does not consider whether the Indonesian data are aberrational or less specific than Ukrainian ten-digit breakout data.

high- and low-carbon steel billet surrogates to Commerce to reconsider whether they are the best

available information on the record compared to other carbon steel billet surrogate data.

   **II.**    **Commerce's Denial of a Byproduct Offset Was Based in Substantial Evidence**

      Plaintiffs next allege that Commerce wrongly withheld a byproduct offset for the scrap

Chengde produced and sold during the review period.  The court finds, however, that Chengde

did not carry its burden to clinch the offset.  The court thus declines to remand the issue.

    **A.  Background**

      Under 19 U.S.C. § 1677b(c)(1), Commerce finds the NV of NME goods by tallying the

cost of inputs used to make the merchandise, then adding an amount for profit and other

expenses.  Pursuant to this calculus, Commerce must decide the "quantities of raw materials

employed" to produce subject goods.  19 U.S.C. § 1677b(c)(3)(B).  Not all raw materials

employed in production become part of the finished product, however.  In recognition of this

fact—and though not required to do so by law—Commerce subtracts or "offsets" from NV the

revenue an exporter earns from selling manufacturing byproducts or scrap.  *See Arch Chems.,*

*Inc. v. United States*, 33 CIT 954, 956 (2009).

      Commerce requires two data points from exporters before it will grant the offset.  First,

the exporter must document how much byproduct it made when producing subject merchandise.

*See id.*  Second, the exporter must show either that the byproduct was resold or that the scrap has

commercial value and reentered the production process.  *Id.*  Exporters usually prove their

entitlement to the offset by furnishing documents that measure the amount of scrap produced and

sold during the review period.  Nevertheless, if an exporter does not record scrap production, the

exporter may still claim the offset if it "reasonably link[s]" the amount of scrap sold during the

review period to the amount produced during the same time.  *See Drawn Stainless Steel Sinks*

*from the People's Republic of China*, 78 Fed. Reg. 13,019 (Dep't Commerce Feb. 26, 2013)

(final determ.) and accompanying Issues & Decision Mem. ("*Stainless Steel Sinks*") at cmt. 9.

By demanding this proof, Commerce excludes scrap made during prior review periods from the

offset formula, and ensures that NV reflects the actual cost of making subject goods.

In its first questionnaire, Commerce asked Chengde whether it made or sold any

byproduct during the review period.  Initial Antidumping Questionnaire ("Initial Q.") at E-9, PD

II 32 (Sept. 19, 2011), ECF No. 46-2 (May 24, 2013).  Chengde reported that it produced steel

scrap, but added that it recorded only scrap sales—not production—on its company books.  C&D

Resp. at D-14, D-15.  Because it did not track scrap production, Chengde proposed an offset ratio

dividing the total scrap it sold by the amount of "green tubes" it made, whether or not those tubes

became subject OCTG.  *Id.* at D-15, D-16, Ex. D-13.

In both the *Preliminary Results* and *Final Results*, Commerce denied Chengde a scrap

offset.  Prelim. Factor Mem. at 4; *I&D Memo* at cmt. 2.  Though Chengde claimed that the

amount of scrap it produced and sold were the same, Commerce found Chengde had not

supported this conclusion "with evidence such as inventory ledgers or inventory out slips."  *I&D

Memo* at cmt. 2.  Thus Commerce found that Chengde had not carried its burden to secure the

offset.  *Id.*

**B.  Discussion**

Plaintiffs allege Commerce committed a raft of errors when it denied Chengde a scrap

offset.  First, they claim the agency has granted scrap offsets based on data similar to the

information Chengde presented below.  Pls.' Br. 23−25.  Second, Plaintiffs argue that Commerce

could not deny the offset before pointing out deficiencies in Chengde's questionnaire responses.

*Id.* at 27−28.  And third, Plaintiffs claim that Commerce needed to explain why Chengde's data were inadequate to secure the offset.  *Id.* 26−29.  None of these arguments persuade.

The reason Commerce denied the scrap offset is simple:  Chengde failed to meet the agency's well-settled prerequisites to secure the deduction.  As discussed above, the law neither requires nor forbids byproduct offsets.  *See Arch Chems.*, 33 CIT at 956; *Guangdong Chems. Imp. & Exp. Corp. v. United States*, 30 CIT 1412, 1422, 460 F. Supp. 2d 1365, 1373 (2006).  In this vacuum of legal guidance, Commerce has chosen to offset scrap revenue only if respondents prove the amount of scrap they made during the review period.  But here, Chengde voiced that it could not corroborate its scrap production.  C&D Resp. at D-14 ("Jiangsu Chengde does not account for the quantity of steel scrap generated in the production process.").  Nor did it corroborate that its scrap production and sales were the same during the review period.  The agency was not required to grant Chengde the offset when it lacked the information needed to do so accurately.  *See Taian Ziyang Food Co. v. United States*, 37 CIT __, __, 918 F. Supp. 2d 1345, 1355 (2013) (holding Commerce must calculate margins "as accurately as possible") (quoting *Shakeproof Assembly Components v. United States*, 268 F.2d 1376, 1382 (Fed. Cir. 2001).

Plaintiffs counter with examples of exporters who did not track scrap production but still got the offset.  Yet none of these cases are relevant here.  For example, in *Multilayered Wood Flooring from the People's Republic of China*, 76 Fed. Reg. 64,318 (Dep't Commerce Oct. 18, 2011) (final determ.) and accompanying Issues & Decision Mem. at cmt. 23, Commerce allowed an offset when it learned that respondent produced and sold wood scraps on a monthly basis. The agency also confirmed that the wood scrap stemmed from the manufacture of subject merchandise.  *Id.*  Chengde, by contrast, did not show that it sold its scrap right after production.

It also failed to prove that the scraps included in its offset ratio were made when producing

subject goods.  *See* C&D Resp. at Ex. D-13.  Because Chengde did not meet its evidentiary

burden, Commerce reasonably denied the offset.  *See* 19 C.F.R. § 351.401(b)(1) (stating

interested party bears burden to prove amount of adjustment to NV).[8]

        The court also disagrees that Commerce needed to identify shortcomings in Chengde's

responses before denying the offset.  Pls.' Br. 27−28.  Under 19 U.S.C. § 1677m(d), if

Commerce "determines that a response to a request for information . . . does not comply with the

request," then the agency must "promptly inform the person submitting the response of the

nature of the deficiency."  This ensures that Commerce's data collection does not morph into an

administrative guessing game, where the agency punishes parties for giving incomplete answers

to cryptic questions.  *See Böwe-Passat v. United States*, 17 CIT 335, 342 (1993) (remanding

where deficiency letter failed to state data needed to grant level-of-trade adjustment).

        Here, however, Commerce told Chengde exactly what it needed: data regarding the

production of steel scrap.  In its lead questionnaire, Commerce asked Chengde to identify by

month the quantity of scrap "produced, sold, [or] reintroduced into production."  Initial Q. at E-9.

It also asked for documents, including "production records demonstrating production of each by-

product/co-product during one month of the [review period]."  *Id.*  In response, Chengde stated

---

[8] Plaintiffs' other cases do not show that Commerce's decision to deny the offset was unreasonable.  In *Stainless Steel Sinks*, Commerce granted an offset because warehouse out-slips supported respondent's claimed rate of scrap production.  *Stainless Steel Sinks* at cmt. 9.  And in *Utility Scale Wind Towers from the Socialist Republic of Vietnam*, 77 Fed. Reg. 75,984 (Dep't Commerce Dec. 26, 2012) (final determ.) and accompanying Issues & Decision Mem. at cmt. 5, Commerce granted an offset for steel scrap because respondent sold scrap each month and based its yield loss ratio on production instructions for subject goods.  Neither of these proceedings helps Chengde, which claimed only that the amount of scrap it sold equaled the amount it produced.
        In fact, Commerce denied an offset for aluminum scrap in *Wind Towers* for much the same reason that it denied an offset to Chengde.  In *Wind Towers*, respondent divided the total amount of aluminum scrap sold by the amount of aluminum used during the investigation period—regardless of whether it related to subject or non-subject goods—and Commerce found these data inadequate to estimate the true amount of scrap made in the manufacture of subject merchandise.  *See id.*

that it kept no records of scrap production.  C&D Resp. at D-14, D-16.  So unlike *Böwe-Passat*—where Commerce made hazy requests for data then punished respondents for failing to deliver—Commerce stated exactly what it needed, and Chengde answered that it could not provide the information.  In such situations, Commerce need not flag deficiencies in a party's responses, because the party never "responded" to the agency's request to begin with.  *See Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1337−38 (Fed. Cir. 2002) ("A failure to respond is not the same as a 'response' as required by the statute.").

In a similar vein, Plaintiffs argue Commerce needed to explain why it rejected the data accompanying Chengde's scrap offset formula.  Pls.' Br. 26−29.  Under § 1677m(e)(3) and (5), the agency must consider a party's submission if it is "not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination" and "can be used without undue difficulties."  Statute also requires Commerce, in general, to calculate NV based on records "kept in accordance with the generally accepted accounting principles ["GAAP"] of the exporting country."  19 U.S.C. § 1677b(f)(1)(A).  According to Plaintiffs, Commerce should have relied on Chengde's GAAP-consistent records to grant the offset.

Commerce complied fully with both of these laws.  In its responses, Chengde provided no evidence to show that the amount of scrap it produced equaled the amount it sold.  Hence, although it did not analyze each § 1677m(e) factor in its analysis, Commerce reasonably concluded that Chengde's data were not a "reliable basis" to permit the offset.  *See I&D Memo* at cmt. 2; 19 U.S.C. § 1677m(e)(3).  Similarly, the agency did not need to grant the offset just because Chengde's books complied with GAAP.  *See* 19 U.S.C. § 1677b(f)(1)(A).  As the agency noted, Chengde's records tracked only scrap sales, and this scrap could have been made during prior review periods or in the manufacture of nonsubject goods.  *I&D Memo* at cmt. 2.

With no data to tie scrap sales to scrap produced, Chengde's records did not reasonably reflect

Chengde's scrap production.  *See Hynix Semiconductor, Inc. v. United States*, 424 F.3d 1363,

1369−70 (Fed. Cir. 2005) (upholding agency's finding that GAAP-compliant books did not

reflect R&D costs).

Commerce's decision to deny the scrap offset was based in substantial evidence and

accorded with law.[9]

### III.    Commerce Properly Used a Surrogate to Value Chengde's Ocean Freight

Plaintiffs also dispute the decision to use a surrogate value to estimate Chengde's ocean

freight costs.  Chengde bought freight services from Korean shippers through Chinese agents,

and Plaintiffs argue Commerce should have used the price Chengde actually paid to value

Chengde's freight.  *See* Pls.' Br. 32−36.  Yet because Plaintiffs could not prove the price

exchanged between Chengde's agents and the Korean shippers, Commerce's choice passes

muster.

#### A.  Background

As discussed above, the law requires Commerce to calculate the NV of NME goods using

surrogate prices from ME countries.  *See* 19 U.S.C. § 1677b(c)(4).  If an NME exporter

purchases inputs directly from ME suppliers, however, then Commerce may value those inputs

using the actual price the exporter paid.  19 C.F.R. § 351.408(c)(1) (2012); *Antidumping*

*Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty*

*Drawback*, 71 Fed. Reg. 61,716, 61,717−18 (Dep't Commerce Oct. 19, 2006) (request for cmts.)

---

[9] Chengde also argues that Commerce incorrectly applied adverse facts available ("AFA") to deny the scrap offset.  *See* Pls.' Br. 30−32.  Yet the AFA regime, by its own terms, applies only where "necessary information is not available on the record."  19 U.S.C. § 1677e(a)(1).  Here, there was no evidentiary gap to fill.  Commerce, in its discretion, offered an offset not required by law, and Chengde could not carry its burden to secure it.

(creating presumption to use market prices if 33 percent or more of input purchased from ME suppliers).

To ship its goods abroad, Chengde hired ocean freight services from a few Korean shippers.  Chengde did not pay the Koreans directly, however.  Instead, it gave money to a freight forwarder, Shanghai Loyal, which in turn liaised with Chinese agents.  These agents then paid the shippers to carry Chengde's freight.  *See I&D Memo* at cmt. 8.

Because Korea is an ME country, Plaintiffs urged Commerce to use the amount Chengde paid the Korean shippers as its freight value.  *See id.*  In support, Chengde provided invoices between itself and its freight forwarder, Shanghai Loyal.  Third Supplemental Resp. ("Third Supp. Resp.") at Ex. S3-4, CD IV 60−65 (May 2, 2012), ECF No. 46-3 (May 24, 2013).  Chengde also furnished documents displaying the amount Shanghai Loyal paid to the Chinese agents who contracted with the Korean shippers.  *Id.* at Ex. S3-5.  Chengde was unable to document how much the Chinese agents paid the Korean shippers, however.  When Chengde asked the agents to disclose how much they paid the shippers, the agents refused to release the data.  In the end, all Chengde could get from the agents was a confirmation that they paid the Korean shippers in U.S. dollars.  *See id.* at Ex. S3-6.

In light of this gap in the record, Commerce declined to use Chengde's proposed ocean freight price in the *Final Results*.  The agency explained that it could not rely on payments between Chinese entities to establish the amount Chengde paid for ME freight services.  *See I&D Memo* at cmt. 8.  Commerce therefore used a surrogate to value Chengde's ocean freight.

## B.  Discussion

On appeal, Plaintiffs argue that Commerce should have valued Chengde's ocean freight using the amount Chengde paid the Koreans through its freight forwarder.  They cite *Certain*

*Polyester Staple Fiber from the People's Republic of China*, 72 Fed. Reg. 19,690 (Dep't

Commerce Apr. 19, 2007) (final determ.) and accompanying Issues & Decision Mem.

("*Polyester Staple Fiber*") at cmt. 15, to show that Commerce does not always require proof of

the price exchanged between agents and ME shippers.  And so, Plaintiffs continue, the agency's

decision to value ocean freight using a surrogate was unlawful.  *See* Pls.' Br. 32−36.

        The court disagrees.  As discussed above, the law presumes that government action

distorts the prices NME exporters pay for their inputs.  *See Blue Field*, 37 CIT at __, 949 F.

Supp. 2d at 1317.  Consequently, before using an NME exporter's actual costs to value freight,

Commerce requires proof of the U.S. dollar amount exchanged between NME shipping agents

and ME carriers.  *See, e.g.*, *Sebacic Acid from the People's Republic of China*, 65 Fed. Reg.

49,537 (Dep't Commerce Aug. 14, 2000) (final admin. review) and accompanying Issues &

Decision Mem. at issue 8.  This ensures that freight prices used in the NV calculus reflect market

reality and not less-than-fair prices traded between NME companies.

        Here, Chengde could not prove the price exchanged between its Chinese agents and the

Koreans, so Commerce reasonably used a surrogate to value ocean freight.  Indeed, the situation

mirrors *Yantai Oriental Juice Co. v. United States*, 26 CIT 605, 614−16 (2002), where plaintiff

proved the price paid to a Chinese freight forwarder but not the price paid to the ME shipper.

*Yantai* affirmed the agency's decision to use a surrogate for ocean freight, because plaintiff had

not shown how a transaction between "two nonmarket entities would be determined by market

forces."  *Id.* at 615−16.  Furthermore, this case is unlike *Polyester Staple Fiber*, where an ME

shipper hired a Chinese agent to collect fees on its behalf.  *Polyester Staple Fiber* at cmt. 15.

Presumably, this contractual arrangement guaranteed that the price paid to the agent and the

price received by the shipper were the same.  *See id.*  Here, however, there is no proof that the

Korean shippers hired the Chinese agents to collect Chengde's fees.  Because the agent and

shippers were unaffiliated, there is little reason to believe that the price paid to the agents

equaled the price remitted to the shippers.[10]

Plaintiffs also argue that Commerce could not punish Chengde for its failure to squeeze

price data from the Chinese agents.  Pls.' Br. 35.  Yet the case Plaintiffs cite for this proposition,

*Shantou Red Garden Foodstuff Co. v. United States*, 36 CIT __, 815 F. Supp. 2d 1311 (2012),

does not jibe.  In *Shantou*, Commerce applied AFA when an exporter failed to secure factor of

production data from a noncomplying supplier.  *Id.* at __, 815 F. Supp. 2d at 1316.  The court

remanded because Commerce had not ordered the plaintiff to solicit the data from the supplier;

hence Commerce's finding that plaintiff had not complied was unsubstantiated in evidence.  *Id.*

at __, 815 F. Supp. 2d at 1317−19.  Here, by contrast, Commerce did not deploy AFA to

calculate Chengde's margins, but instead used a surrogate where the evidence did not justify

using Chengde's actual costs.  This approach was permissible and not punitive.

Finally, Plaintiffs argue that Commerce's surrogate was not specific to Chengde's ocean

freight.  Pls.' Br. 36.  Chengde shipped its wares in bulk, but Commerce used the cost to ship a

full container as its ocean freight value.  The court rejects this argument, however, on procedural

grounds.  During the review, Plaintiffs never said Commerce's surrogate was insufficiently

specific to Chengde's input.  And although ATP arguably broached the topic in its case brief, it

relegated its discussion to a one-sentence footnote.  *See* ATP Case Br. 23 n.46.  This meager

effort was not enough to exhaust the argument for appeal.  *See* 28 U.S.C § 2637(d) (requiring

---

[10] Chengde argues that it *did* document the price between the agent and shippers, that is, it proved there was a U.S. dollar settlement between the Chinese agents and the Korean suppliers. Pls.' Br. 34. But the fact that the companies exchanged U.S. currency is unimportant. Chengde failed to prove the *amount* of money paid to the shipper, and this is the information Commerce needed to confirm Chengde's freight costs.

exhaustion); *see also SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (holding arguments footnoted in opening brief not preserved).[11]

The decision to use a surrogate to value ocean freight was moored in substantial evidence and accorded with law.

### IV.    Commerce Reasonably Selected a Surrogate for Inland Freight Expenses

Next, Plaintiffs claim that Commerce chose a flawed surrogate for Chengde's inland freight expenses.  Pls.' Br. 37−40.  This argument fails too, because there was no inland freight surrogate on the record besides the one Commerce used.

### A.  Background

Once again, Commerce must value inputs into NME goods using "the best available information" on the record.  19 U.S.C. § 1677b(c)(1).  One such input was truck freight services, by which Chengde shipped OCTG from its factory to an inland port 7.5 kilometers away, then on to the port of exit 280 kilometers further.  C&D Resp. at C-22.

To value inland freight, Commerce used a rate schedule from Indonesian freight forwarder PT Mantap Abiah Abadi ("PT Mantap").  Prelim. Factor Mem. at Attach. 3. Commerce based the rate on shipments between 50 and 200 kilograms from Jakarta to twelve outlying cities.  *See id.*  This calculus yielded a freight rate of 5.433 Indonesian rupiah per kilogram per kilometer.  Final Analysis Mem. at Attach. 1.  No other party—Plaintiffs included—proposed an alternative surrogate value for inland freight.

---

[11] Even if Chengde exhausted its specificity argument, the court still rejects it.  In support of its position, Chengde cites *Home Meridian International, Inc. v. United States*, 36 CIT __, __, 865 F. Supp. 2d 1311, 1316−19 (2012).  There, Commerce rejected non-contemporaneous actual prices in favor of a contemporaneous third-country surrogate to value a major input.  *Id.* at 1316.  The court held it was unreasonable to ignore otherwise valid market prices when contemporaneous surrogates were flawed.  *Id.* at 1319.  Yet in this case, Commerce considered the proposed ME price for ocean freight and found it unreliable, and for good reason: Chengde offered no evidence to support the price supposedly paid to the market economy shippers.

In its case brief, ATP argued that Chengde shipped its goods in volumes comparable to a full container load.  ATP Case Br. 18−20.  As a consequence, ATP claimed Commerce should have priced inland freight on a per-metric ton basis rather than a per-kilogram basis.  *Id.*  Commerce rejected this argument in the *Final Results* because there was "no evidence on the record as to whether Chengde shipped full container loads by truck" during the review period.  *I&D Memo* at cmt. 9.  The agency also noted that the record lacked per-metric ton inland freight surrogates.  *Id.*

### B.  Discussion

On appeal, Plaintiffs offer two main reasons why Commerce could not rely on the PT Mantap data to value inland freight.  First, Chengde sold OCTG in volumes much greater than a ton, meaning kilogram-based freight rates were likely too high, and second, the PT Mantap data were not authenticated.  Pls.' Br. 37–40.  Neither of these arguments prevails, however, because there were no inland freight surrogates on the record besides the one Commerce used.

The court cannot find any precedent—and the parties cite none—requiring Commerce to hunt for surrogates when relevant data are already on the record.  The law surely compels Commerce to use the "best available information" to value inputs, 19 U.S.C. § 1677b(c)(1), but the law also sets the burden of supplying record data on the parties, *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (quoting *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 16 CIT 931, 936, 806 F. Supp. 1008, 1015 (1992)) ("[T]he burden of creating an adequate record lies with [interested parties] and not with Commerce.").  In this case, the record sported only one option for pricing inland freight: the PT Mantap per kilogram rate.  Plaintiffs argue these data were flawed,[12] yet without an alternative value to choose, Commerce reasonably

---

[12] Plaintiffs have not proven here that the PT Mantap data were unrepresentative.  Although they now claim that the volume of Chengde's smallest U.S. sale during the review was [[       ]] metric tons, (footnote continued)

relied on that information to price inland freight.  *See Ames True Temper v. United States*, 31

CIT 1303, 1310−13 (2007) (sustaining agency's choice to use only brokerage and handling

surrogate in record and not surrogate from prior reviews).  If Chengde wanted the agency to use

a different surrogate, it should have provided one, as respondents have done in past reviews.

*See, e.g.*, *Certain Steel Wheels from the People's Republic of China*, 77 Fed. Reg. 17,021 (Dep't

Commerce Mar. 23, 2012) (final determ.) and accompanying Issues & Decision Mem. at cmt. 5

(using per-ton freight rate after respondent added full-container shipping data to record).

Plaintiffs nevertheless contend that "Commerce routinely supplements the record with

surrogate value data it considers reliable."  Pls.' Br. 39.  Yet this argument ignores a critical

point.  Although Commerce may supplement the record where it lacks reliable surrogate values,

this discretion does not shift from respondents the burden to provide surrogate data.  *See QVD*

*Food*, 658 F.3d at 1324.  Nor has anyone proven that Commerce supplements the record with its

own research as a matter of binding agency practice.  *See* Pls.' Br. 39−40 (citing three reviews,

not of OCTG, where Commerce voluntarily supplemented record); *Huvis Corp. v. United States*,

31 CIT 1803, 1811, 525 F. Supp. 2d 1370, 1378 (2007) (recognizing agency binding practice

where "uniform and established procedure exists that would lead a party, in the absence of

notification of a change, reasonably to expect adherence to the [action] or procedure").  Hence

Commerce's decision to use the PT Mantap data as a surrogate value for inland freight was

neither arbitrary nor unfounded in substantial evidence.

---

*see* Pls.' Br. 38, Plaintiffs did not cite this figure below to challenge Commerce's inland freight surrogate, *see* ATP
Case Br. 18−20.  This means the argument was not exhausted—yet even if it were, simply because Chengde sold its
wares in the United States in tons does not mean it shipped its goods to the port of exit in tons.  *See* U.S. Steel Br.
40.  Furthermore, Chengde's brief neither disproves the authenticity of the PT Mantap data nor identifies anything
unreasonable in Commerce's interpretation thereof.  *See* Pls.' Br. 40.  As such, the court finds the agency's surrogate
choice was reasonable on the record available.

### V.        Commerce Reasonably Treated Thread Protectors as a Direct Input

Finally, Plaintiffs challenge the decision to include thread protectors as a direct input into Chengde's OCTG.  Pls.' Br. 40−43.  They claim thread protectors are better described as a packing material.  The court rejects this argument, however, because Commerce reasonably interpreted the antidumping duty order and record evidence to classify thread protectors as direct inputs.

### A.  Background

When calculating the NV of NME goods, Commerce adds an amount for overhead, profit, and other expenses attributable to the manufacture of the merchandise.  *See* Pls.' Br. 41; 19 U.S.C. § 1677b(c)(1).  Commerce calculates these expenses as a fraction of the cost of inputs directly consumed in the goods.  *See* Prelim. Analysis Mem. at Attach. I, CD IV 68 (May 30, 2012), ECF No. 46-3 (May 24, 2013).  Hence, if Commerce classifies an input as a material part of the product, that input will inflate the exporter's general expenses.  Conversely, if Commerce classifies an input as an indirect material, such as packaging, then the agency excludes that cost when generating the exporter's expenses.  *See* Pls.' Br. 41.

In this case, Commerce included thread protectors as a direct input into Chengde's OCTG.  *See* Prelim. Factor Mem. at Attach. I.[13]  ATP challenged this decision in its case brief, arguing "the Department should only include the surrogate value for threading protectors as a packing expense."  ATP Case Br. 21.  Nevertheless, in the *Final Results*, Commerce deemed that thread protectors were part of the subject merchandise.  In support, the agency cited the OCTG antidumping duty order and American Petroleum Institute ("API") standards treating thread

---

[13] In fact, Commerce double counted thread protectors for certain control numbers in the *Preliminary Results*, deeming them both direct and indirect materials.  In the *Final Results*, however, Commerce classified thread protectors only as a direct material.  *I&D Memo* at cmt. 7.

protectors as an integral part of the subject goods.  *See I&D Memo* at cmt. 7 (discussing API-5CT tubing).

### B. Discussion

On appeal, Plaintiffs challenge Commerce's decision to classify thread protectors as a direct material.  Pls.' Br. 40−43.  They begin with the language of the antidumping duty order, which encompasses "certain OCTG . . . regardless of end finish (e.g., whether or not plain end, threaded, or threaded and coupled) . . . whether or not thread protectors are attached."  *OCTG Order* at 28,553.  In Plaintiffs' view, the words "whether or not thread protectors are attached" means the protectors are not part of the subject good.  *See* Pls.' Br. 41−42.  Plaintiffs also argue that the statute's definition of packing materials embraces thread protectors, and in support, they cite purchase contracts listing end protectors as a packing item.  *Id.* at 42.

The court disagrees.  To begin, the antidumping order does not clearly include or exclude thread protectors as a part of subject OCTG.  Although the clause "whether or not thread protectors are attached" suggests protectors are not a part of the good, other language betokens the opposite.  Immediately following Plaintiffs' favored phrase, the order states "[e]xcluded from the scope of the order are . . . unattached thread protectors."  *OCTG Order* at 28,553.  Because the government excluded unattached thread protectors from the order's scope, Commerce inferred that attached protectors are part of the subject good.  *See I&D Memo* at cmt. 7.  The court will defer to this reasonable interpretation of the order.  *See Global Commodity Grp. LLC v. United States*, 709 F.3d 1134, 1138 (Fed. Cir. 2013) (granting Commerce "significant deference" to interpret scope of antidumping order).

Furthermore, the statute does not compel Commerce to classify thread protectors as a packing material.  19 U.S.C. § 1677b(a)(6)(B)(i) defines packing materials as "containers and

coverings . . . incident to placing the foreign like product in condition packed ready for shipment

to the place of delivery to the purchaser."  Yet as U.S. Steel points out, thread protectors not only

preserve OCTG during shipment, but also protect the goods from dust and water damage in

storage.  U.S. Steel Br. 42; First Supp. Resp. at Ex. S1-9 (ISO 11960 document requiring thread

protectors to protect OCTG during transit and "normal storage period" of one year); *see also*

*Fresh Garlic from the People's Republic of China*, 72 Fed. Reg. 34,438 (Dep't Commerce June

22, 2007) (final admin. review) and accompanying Issues & Decision Mem. at cmt. 10 (treating

jars as direct material because they extended shelf life of peeled garlic).  This suggests thread

protectors are more than a mere incident to shipping.

    Finally, Chengde's own response defines thread protectors as a direct input.  In the

second supplemental questionnaire, Commerce asked whether Chengde used anything to pack its

OCTG other than iron or steel straps and buckles.  In answer, Chengde wrote, "Jiangsu Chengde

reported the threading protector as a packing material for convenience.  However, API-5CT [the

specification for the OCTG in question] treats threading protector as part of subject

merchandise."  Second Supp. Resp. 11.  And immediately thereafter, Chengde confirmed that it

used no other packing materials "[e]xcept steel belts and steel buckles."  *Id.*  These data implied

that thread protectors are direct inputs, and although ATP listed protectors as a packing material

in its purchase orders, Commerce had discretion, when faced with conflicting record evidence, to

choose the result that it found more plausible.  *See Home Meridian Int'l, Inc. v. United States*, 37

CIT __, __, 922 F. Supp. 2d 1366, 1376 (2013) ("When presented with conflicting evidence that

provides substantial evidence to support opposite conclusions, the court will defer to

Commerce's reasoned choice between the two.").  Commerce's designation of thread protectors

as a direct input was grounded in substantial evidence and accorded with law.

**CONCLUSION AND ORDER**

In summary, the court sustains Commerce's decision making regarding steel scrap, ocean freight, inland freight, and thread protectors.  Commerce's reasoning regarding steel billet, however, was not similarly sound.  On remand, Commerce must reconsider its classification of Chengde's billet inputs as alloy steel or carbon steel.  And pursuant to its voluntary remand, Commerce must also reconsider whether the Indonesian GTA data are the best available information on the record to value high- and low-carbon steel billet.

Upon consideration of all papers and proceedings herein, it is hereby:

**ORDERED** that the final determination of the International Trade Administration, United States Department of Commerce, published as *Certain Oil Country Tubular Goods from the People's Republic of China*, 77 Fed. Reg. 74,644 (Dep't Commerce Dec. 17, 2012) (final admin. review), as amended by *Certain Oil Country Tubular Goods from the People's Republic of China*, 78 Fed. Reg. 9033 (Dep't Commerce Feb. 7, 2013), be, and hereby is, REMANDED to Commerce for redetermination; it is further

**ORDERED** that Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record be, and hereby is, GRANTED as provided in this Opinion and Order; it is further

**ORDERED** that Commerce shall issue a redetermination ("Remand Redetermination") in accordance with this Opinion and Order that is in all respects supported by substantial evidence, in accordance with law, and supported by adequate reasoning; it is further

**ORDERED** that Commerce shall reevaluate the chemical composition of billet used to make the OCTG sold under contracts [[                    ]]—explaining whether Chengde's mill certificates (*supra* Table 2 no. 7) establish the chemical properties of OCTG not specifically tested in those certificates—and shall redetermine surrogate values for that billet in accordance with this explanation; it is further

**ORDERED** that Commerce shall reevaluate the chemical composition of billet used to make the OCTG sold under contract [[      ]]—explaining whether Chengde's entry summary (*supra* Table 2 no. 9) establishes the chemical properties of OCTG described in that summary— and shall redetermine surrogate values for that billet in accordance with this explanation; it is further

**ORDERED** that Commerce shall reconsider its decision to use Indonesian GTA data under HTS 7207.19 and 7207.20 as surrogate values for high- and low-carbon steel billet, and in doing so, must determine whether such surrogates represent the "best available information" on

the record in accordance with 19 U.S.C. § 1677b(c)(1), as compared with alternative surrogates in the record; it is further

      **ORDERED** that Commerce shall recalculate Chengde's weighted-average dumping margin consistent with the reevaluated surrogate values for steel billet; it is further

      **ORDERED** that Commerce shall have ninety (90) days from the date of this Opinion and Order in which to file its Remand Redetermination, which shall comply with all directives in this Opinion and Order; that the Plaintiff and Defendant-Intervenor shall have thirty (30) days from the filing of the Remand Redetermination in which to file comments thereon; and that the Defendant shall have thirty (30) days from the filing of Plaintiff and Defendant-Intervenor's comments to file comments.

 

                                    /s/ Richard W. Goldberg
                                    Richard W. Goldberg
                                    Senior Judge

Dated: September 26, 2014
New York, New York