Slip Op. 15-98

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AMERICAN TUBULAR PRODUCTS, LLC, and JIANGSU CHENGDE STEEL TUBE SHARE CO., LTD.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>UNITED STATES STEEL CORPORATION, TMK IPSCO, WHEATLAND TUBE COMPANY, and V&M STAR L.P.,<br><br>Defendant-Intervenors. | Before: Richard W. Goldberg, Senior Judge<br>Court No. 13-00029<br><br>**PUBLIC VERSION** |

## <u>OPINION</u>

[The court sustains the remand results of an administrative review of an antidumping duty order on oil country tubular goods from the People's Republic of China.]

Dated:  August 28, 2015

*Julie C. Mendoza*, *Donald B. Cameron*, *R. Will Planert*, *Brady W. Mills*, *Mary S. Hodgins*, and *Sarah S. Sprinkle*, Morris, Manning & Martin LLP, of Washington, DC, for plaintiffs.

*L. Misha Preheim*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant.  With him on the brief were *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director.  Of counsel on the brief was *Whitney Rolig*, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

*Robert E. Lighthizer*, *Jeffrey D. Gerrish*, and *Luke A. Meisner*, Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, DC, for defendant-intervenor United States Steel Corporation.

Goldberg, Senior Judge:   In its previous opinion, the court invalidated the final results of

the 2010−2011 review of the antidumping order on certain oil country tubular goods ("OCTG")

from the People's Republic of China ("PRC").   *See Certain Oil Country Tubular Goods from the*

*People's Republic of China*, 77 Fed. Reg. 74,644 (Dep't Commerce Dec. 17, 2012) (final admin.

review) ("Final Results").   The court remanded two decisions for the Department of Commerce

("Commerce" or "the agency") to reconsider: (1) the choice to value steel billet, an input used to

make OCTG, as alloy steel, and (2) the decision to use Indonesian surrogate values as stand-in

prices for carbon steel billet.   *See Am. Tubular Prods., LLC v. United States*, Slip Op 14-116,

2014 WL 4977626, at *17 (CIT Sept. 26, 2014).

On remand, the agency revised the former decision, but not the latter.   First, Commerce

found that it lacked the evidence necessary to value most of the billet as alloy steel.   It opted

instead to value a majority of billet using a simple average of alloy and carbon steel prices.   *See*

Final Results of Redetermination Pursuant to Remand 4−9, ECF No. 101-1 ("Remand Results").

Second, the agency held that its original surrogate values for carbon steel billet were reasonable.

*Id.* at 9−11.

Plaintiffs Jiangsu Chengde Steel Tube Share Co. ("Chengde") and American Tubular

Products, LLC ("ATP") (collectively "Plaintiffs") now challenge both remand decisions as

unsubstantiated in evidence and contrary to law.   Defendant-intervenor the United States Steel

Corporation ("U.S. Steel") also lodges a challenge, but only regarding the decision to value the

billet using a simple average of carbon and alloy steel prices.   Yet none of these objections have

traction.   The court finds that Commerce's determinations on remand were grounded in the

record and accorded with law.   The court sustains the Remand Results in all their particulars.

## <u>BACKGROUND</u>

Here, as before, the discussion focuses on the process used to estimate normal value

("NV") for nonmarket economy merchandise.  When Commerce calculates NV for goods from

China or other nonmarket countries, it starts by selecting artificial market prices or surrogate

values for each input consumed in production.  *See* 19 U.S.C. § 1677b(c)(1) (2012).  The statute

requires that surrogates be made of the "best available information" on the record.  *Id.*  And by

regulation, Commerce will normally value each input using data from a single market economy

at a level of development comparable to country under review.  *See* 19 C.F.R. § 351.408(c)(2)

(2015).  The agency then adds up the surrogate values for each input—along with amounts for

general expenses, profit, and other costs—to form NV.

Commerce was supposed to follow these rules as it created surrogates for Chengde's steel

billet.  The agency strayed from the path during the review below, but it made appropriate course

corrections on remand.  The sections that follow outline the agency's original decision, the

court's critique of that decision, and the revised results after reconsideration.

### I.     The Administrative Proceeding

In its prior opinion, the court outlined relevant record data and explained how Commerce

chose surrogates for billet.  The explanation was comprehensive and included two charts that

may be of use to those with access to the confidential docket.  *See* Confidential Slip Op. 7, 10,

ECF No. 94 ("Conf. Slip Op."); *see also Am. Tubular Prods.*, 2014 WL 4977626, at *3−5.  For

the rest, the court repeats the key developments that shaped the agency's surrogate value

decisions.

**A.  The Agency Determines the Type of Billet Consumed**

At the review's outset, Commerce asked Chengde to identify the ingredients it used to make OCTG.  Chengde responded that it consumed steel billet, among other things, and it named Harmonized Tariff Schedule ("HTS") 7224.90.0075 as the proper tariff subheading for the input. Chengde Resp. to Sections C&D Questionnaire ("C&D Resp.") at Ex. D-5, CD IV 19−23 (Nov. 17, 2011).  Subheading 7224.90 covers semifinished products of alloy steel, not carbon steel.

The agency later issued a supplemental questionnaire to gather more information about Chengde's billet.  The appeal for data was meticulous in its detail.  To begin, Commerce asked "for a complete technical description" of each input, including "chemical specifications, purity, grades/standards, and mineral/metal content."  First Suppl. Questionnaire ("First Suppl. Q.") at 6, CD IV 30 (Jan. 6, 2012).  The agency then solicited product grades where applicable, complete specifications for each grade reported, and purchase contracts, supplier's invoices, packing lists, and certificates of assay.  *Id.*  The questions were calibrated to establish the chemical makeup of the billet beyond the basic description in the initial response.

Chengde's answers were less than complete, however.  For a technical description of the billet, Chengde offered only that its inputs complied with standards from the American Society of Mechanical Engineers ("ASME").  *See* First Suppl. Resp. ("First Suppl. Resp.") at Ex. S1-15 (S1-4), CD IV 36−43 (Jan. 11, 2012).  The ASME standards gave a range of chemical content for compliant billet, but they did not confirm whether the billet was carbon or alloy steel.  *See* Resp. to Section A Questionnaire at Ex. A-19, CD IV 14−18 (Oct. 20, 2011).  Chengde also furnished a few purchase contracts from a billet supplier.  The contracts said the billet had to conform to the seller's "Product Quality Certificate" or the "technical agreement between [the]

two parties," but neither of these side items were given to the agency.  First Suppl. Resp. at Ex. S1-16 (S1-5).  The first supplemental response added little, if anything, to the initial reply.

Commerce sent a second round of supplemental questions shortly thereafter, but the line of inquiry differed from the first round.  In an earlier response, Chengde had given the agency a few of its OCTG sales contracts.  The contracts mentioned that Chengde would send ATP "product quality certificates" and "mill test reports" when it shipped the goods.  *Id.* at Ex. S1-5. In the second supplemental questionnaire, Commerce asked Chengde to submit such certificates for each unique OCTG product sold.[1]  The agency wrote, in its own words,

> Please submit sample product quality certificates and mill test reports/certificates for all control numbers ("CONNUMS") sold during the [review period].  Submit one product quality certificate and one mill test report for each CONNUM for each month during the [review period] in which that CONNUM was produced.

Second Suppl. Questionnaire ("Second Suppl. Q.") at 4, CD IV 47 (Feb. 29, 2012).  So unlike the inquiry in the first supplemental questionnaire, the request in the second supplemental questionnaire did not focus on the chemical makeup of Chengde's billet.  Instead the questions centered on the OCTG sales contracts and Chengde's promise to deliver mill certificates to ATP.

In response, Chengde furnished the first page of ten mill test reports, but for only six of the nine CONNUMs sold during the review period.  It was also unclear whether Chengde had submitted a report for each CONNUM for each month in which the CONNUMs were produced. *See* Second Suppl. Resp. ("Second Suppl. Resp.") at Exs. S2-13, S2-14, CD IV 50−58 (Mar. 15, 2012).  Even so, contrary to the respondent's initial declaration, the mill certificates showed that the tube tested therein was made of high or low *carbon* steel, not alloy steel.  High carbon steel

---

[1] The agency identifies distinct products by assigning each a control number, or "CONNUM."  A CONNUM is a set of numeric digits representing "a hierarchy of specified physical characteristics" that may vary from one proceeding to the next. *Union Steel v. United States*, 36 CIT __, __, 823 F. Supp. 2d 1346, 1349 (2012). "All products whose product hierarchy characteristics are identical are deemed to be part of the same CONNUM and are regarded as 'identical' merchandise" for the purpose of comparing export prices to NV. *Id.*

has a carbon content of 0.25% or more by weight, and low carbon steel has a carbon content of

less than 0.25% by weight.  *See* HTS 7207.19−20.  Plaintiffs urged the agency to value all of

Chengde's billet as carbon steel in light of the mill reports.  ATP Revised Case Br. at 3−13, CD

IV 73 (Aug. 3, 2012); Chengde Revised Case Br. at 1−9, PD II 144 (Aug. 2, 2012).

  The agency wove these threads of data into surrogate values for billet in the Final

Results.  As a first step, Commerce had to decide whether the inputs were alloy or carbon steel.

It relied chiefly on Chengde's declaration in the initial response that the billet was alloy.  *See*

Issues & Decision Mem. ("I&D Mem.") at 8−10, PD II 164 (Dec. 6, 2012).  The agency also

credited a website which suggested that some of Chengde's pipe was alloy metal.  This evidence

led Commerce to conclude that [[  ]] of the billet was alloy steel.  *See* Conf. Slip Op. 7−9.

Nevertheless, because billet bears the same chemical signature as finished OCTG—and because

the OCTG sampled in the mill reports was carbon steel—Commerce deemed that [[  ]] of

the billet was carbon steel.  *Id.*  By doing so, the agency rejected Plaintiffs' argument that all of

the billet was carbon metal, and that Chengde reported using alloy billet in error.  Yet Commerce

never said why the mill reports failed to establish the chemical makeup of billet that had not been

tested.  The omission seemed odd, because Chengde's mill reports sampled OCTG from six of

the nine CONNUMs sold during the review period.  Presumably, the chemical signature of

OCTG that had been tested would be the same as that of untested yet commercially identical

merchandise.

### B.  The Agency Selects Surrogate Values for Carbon Steel

  Next, after deciding the chemical makeup of Chengde's billet, Commerce had to forge a

surrogate value for each type of billet consumed.  For carbon steel billet, the agency crafted a

composite surrogate using prices for low and high carbon steel.  Commerce drew price data from

2011 Indonesian import statistics in the Global Trade Atlas ("GTA").  *Id.* at 10.  The GTA listed

all imports of high and low carbon steel products to Indonesia by country, quantity, and price.

With this information in hand, the agency proceeded to exclude any data from nonmarket

economies, from countries with generally available export subsidies, and without quantity or

price terms.  *See* Final Analysis Mem., CD IV 80 (Dec. 5, 2012).  Commerce also excluded

import prices that it deemed aberrational.  For low carbon steel, this meant the agency deleted

data from six countries, which each had low import quantities and average unit values ("AUVs")

more than five times the highest remaining import price.  For high carbon steel, by contrast,

Commerce excluded only one aberrant value.  The omitted value comprised imports from

Malaysia, which exceeded the next highest import value by 2.4 times.  With these data scrubbed

from the set, Commerce rendered a weighted AUV of $566.64 per metric ton ("MT") for low

carbon steel.  The weighted AUV for high carbon steel was $1,149.40/MT.  Together, the

weighted average surrogate value for carbon steel was $813.86/MT.

Finally, to check whether the AUVs were reasonable, Commerce compared its surrogates

to "benchmarks," or average import prices from countries economically similar to the PRC.  For

low carbon steel, Commerce found the Indonesian surrogate fell between benchmarks from the

Philippines ($1740.68/MT), South Africa ($1270.96/MT), and Ukraine ($600.57/MT).  I&D

Mem. at 11.  Furthermore, though the Indonesian value for high carbon steel exceeded those

from Thailand ($567.55/MT) and Ukraine ($653.84/MT), the agency said the surrogate was not

so high as to be "distortive or misrepresentative."  *Id.*  Hence Commerce used the Indonesian

data to value both low and high carbon steel over Plaintiffs' objections.

## II.      The Court Case

On appeal, Plaintiffs contested the decision to value most of Chengde's billet as alloy steel.  Pls.' Mot. for J. on Agency R. 12−18, ECF No. 39-1 ("Pls.' Br.").  They also argued that the Indonesian surrogate for high carbon steel was aberrantly high.  *Id.* at 19−20.

The United States, for its part, requested a voluntary remand to decide if its carbon steel surrogates were substantiated in evidence.  Def.'s Resp. to Pls.' Rule 56.2 Mot. for J. on Agency R. 19, ECF No. 67 ("Gov't Br.").  In the I&D Memo, the agency used petitioner's data as benchmarks, but it forgot to delete prices from nonmarket economies, from countries with generally available export subsidies, and with missing quantities or values.  *See* Remand Results 9−10.  Commerce wished to redo the analysis to make sure its carbon steel surrogates looked reasonable compared to properly manicured benchmarks.

The court granted a remand on both issues.  To begin, the court scrutinized how the agency determined the chemical makeup of Chengde's billet.  It divided the analysis by each OCTG contract sold during the review period.[2]  For instance, the court sustained the conclusion that OCTG sold under contracts [[                           ]] was made of alloy steel billet.  None of the mill reports tested the tube sold in these contracts, but a website confirmed that the goods were alloy.  *See Am. Tubular Prods.*, 2014 WL 4977626, at *6.  The court also sustained the decision that the OCTG sampled in the mill certificates was carbon steel.  *Id.*  But the court reversed the determination that billet used to make OCTG in contract [[       ]] was alloy steel.  A U.S. Customs and Border Protection ("CBP") entry summary said this OCTG was carbon

---

[2] Please see the court's prior confidential opinion at Table 1 for a concise description of the thirteen sales contracts exchanged during the review period.  Table 1 lists each contract number, the model of OCTG sold under the contract, the CONNUM sold under the contract, the amount of OCTG from the contract sampled in the mill reports, and the total amount of OCTG sold under the contract.  *See* Conf. Slip Op. 7.  Unfortunately, Table 1 as rendered in the public version is less useful owing to redactions.

steel, so the court made the agency reassess the makeup of these billets in light of the evidence. *Id.* at *7.  The court also asked Commerce to consider whether the mill reports established the chemical properties of OCTG that had not been tested.  In their brief, Plaintiffs noted that OCTG sampled in the mill reports represented six of the nine CONNUMs and ten of the thirteen contracts sold during the review period.  *See* Pls.' Br. 12.  One might assume, then, that sampled OCTG bore the same chemical traits as unsampled OCTG in the same CONNUM and contract. The court remanded so the agency could explain whether this assumption was correct.[3] Commerce would then recalculate the percentage of Chengde's billet that was alloy or carbon steel based on its assessment.  *See Am. Tubular Prods.*, 2014 WL 4977626, at *7.

The court also remanded the high carbon steel surrogate issue at the agency's request. Commerce was ordered to reconsider whether the Indonesian surrogates were "the best available information on the record compared to other carbon steel billet surrogate data."  *Id.* at *9.

### III.    The Remand Results

On remand, the agency tackled both issues that the court returned for reconsideration. The effort yielded major changes in the way Commerce viewed the balance between carbon and alloy steel billet.  As an initial matter, the agency continued to find that OCTG sold in contracts [[                              ]] was alloy steel.  *See* Remand Results 8−9.  It also conceded that the OCTG sampled in the mill reports was carbon steel.  *See id.* at 5.  But in a departure from its previous position, Commerce decided that the OCTG sold in contract [[        ]] was carbon steel.  The agency cited the CBP entry summary in support of the change.  *Id.* at 8.

Commerce also took a fresh look at the OCTG not tested in the mill certificates.  Though the Final Results held that untested OCTG was alloy steel, the agency now said it could not

---

[3] Commerce had to address the mill test issue for OCTG sold in contracts [[
]].  *Am. Tubular Prods.*, 2014 WL 4977626, at *7.

determine the chemical traits of unsampled OCTG with the proof at hand.  While some data

suggested that the billet was alloy—e.g., Chengde's initial questionnaire response and the

website—the evidence did not stretch to cover all of the unsampled OCTG.  The mill tests

debunked the notion that *all* the OCTG was alloy, and the website only established the status of

pipe sold in contracts [[                                    ]].  *See id.* at 12−13.  Conversely, though the mill

tests showed that some of the billet was carbon steel, they did not prove that all the unsampled

billet was carbon.  Commerce asked for a direct account of the billet's chemical composition in

the first supplemental questionnaire, but Chengde never supplied one.  And the mill reports,

which did not cover every CONNUM in the month produced, failed to explain how the tests

were run or whether they represented the chemical properties of untested merchandise.  *See id.* at

13−14.  Given these ambiguities, Commerce chose to value the untested billet using a simple

average of the alloy and carbon steel surrogates.  *Id.* at 9.

Finally, Commerce decided if its surrogates for carbon steel billet were reasonable.  It

first purged the datasets of information from nonmarket economies, from countries with

generally available export subsidies, and with missing quantities or values.  *Id.* at 10.  Then it

compared the two carbon steel surrogates to benchmarks.  For low carbon steel, the agency

found that the surrogate fell just below the least expensive comparable benchmark.  For high

carbon steel, the surrogate landed in the middle of its class—above the Thailand at $567.55/MT

and below the Philippines at $2211.14/MT.  Commerce inferred from these comparisons that

neither of its carbon steel surrogates were aberrational.  *Id.* at 11.

After making its revisions on remand, Commerce unveiled a new, 137.62% weighted-

average dumping margin for Chengde's OCTG.  *Id.* at 24.  This was a 20.24% reduction from

the 172.54% rate assigned in the Final Results.  *See* Final Results at 74,645.

## DISCUSSION

Now in their remand comments, Plaintiffs and U.S. Steel contest the decision to use an alloy-carbon average as a surrogate for some of Chengde's billet.  Plaintiffs also challenge the agency's reliance on Indonesian import data to represent high carbon steel.  But none of these arguments withstand scrutiny.  On remand, the agency took sensible positions that were firmly rooted in substantial evidence.  *See* 19 U.S.C. § 1516a(b)(1)(B)(i).  The court thus sustains them.

### I.       Commerce Reasonably Determined the Composition of Steel Billet

To begin, the court examines whether the agency properly decided the chemical makeup of Chengde's billet.  But before diving into this analysis, we first name aspects of the remand decision that the parties *do not* contest.  Neither Plaintiffs nor U.S. Steel challenges the finding that tube in contracts [[                              ]] was made of alloy billet.  And neither dispute that the OCTG in contract [[          ]] was carbon metal.  *See* Pls.' Comments on Commerce's Draft Results of Redetermination Pursuant to Remand 2 n.1, ECF No. 106 ("Pls.' Cmts."); Comments of U.S. Steel Corp. on Final Results of Redetermination Pursuant to Ct. Remand 7−8, ECF No. 104 ("U.S. Steel Cmts.").  U.S. Steel hints that OCTG tested in the mill reports was not really carbon steel, but it did not raise this issue as a legal claim.  *See* U.S. Steel Cmts. 9.  That leaves one key item for the court to review: the choice to value billet from untested OCTG using a simple average of alloy and carbon steel prices.

On that score, Plaintiffs take an all-or-nothing stance.  They argue now, as before, that *all* OCTG not proven to be alloy was made of carbon steel.  By requesting only sample mill reports in the second supplemental questionnaire, Commerce implied that sample data could prove the chemical content of the billet, tested or not.  Because each report analyzed OCTG from just one contract—and because each contract sold only one CONNUM—Plaintiffs argue that the mill

reports established the chemical traits of all OCTG sold under the contracts with mill reports. *See* Pls.' Cmts. 1−2.  In their view, Commerce failed to rebut this argument on remand.

U.S. Steel also takes an extreme position.  Though it agrees with Commerce that the mill reports do not represent goods not specifically tested, U.S. Steel goes a step further:  It insists that any billet not specifically tested was alloy steel.  As proof, it points to Chengde's initial statement that its billet was alloy—a statement that went unchallenged until the case brief.  It also highlights Chengde's failure to submit mill reports for contracts that later proved to sell alloy steel tube.  U.S. Steel Cmts. 11−12.  From these two facts, U.S. Steel infers "that Chengde selectively submitted some mill certificates showing it used carbon steel billets but withheld mill certificates that would have shown it used alloy steel billets."  *Id.* at 12.  And the only reason Chengde would have submitted certificates selectively, U.S. Steel opines, is if "the merchandise not covered by the mill certificates . . . was produced using alloy steel billets."  *Id.*

The court can endorse neither this argument nor the Plaintiffs'.  In its previous opinion, the court asked Commerce to "explain whether Chengde's mill certificates prove the chemical properties of OCTG not specifically tested in those certificates."  *Am. Tubular Prods.*, 2014 WL 4977626, at *7.  Commerce answered with an unequivocal "no" on remand, and the court finds the agency adequately explained its reasoning.  The court also finds U.S. Steel's argument too speculative to support valuing the billet used to make the unsampled tube as alloy steel.

The reasonability of the agency's redetermination comes into focus by breaking down the task on remand.  At its core, the court's previous opinion asked Commerce to confirm or reject two assumptions underpinning Plaintiffs' argument.  The first is that OCTG in same CONNUM, or sold in same contract, bears a uniform chemical makeup.  The second is that the chemical makeup was accurately depicted in the mill reports.  If all merchandise sold under a contract or

CONNUM had the same chemical signature, and if the mill reports showed that chemical

signature was carbon steel, then all merchandise in that CONNUM or contract must be carbon

steel.  To fulfill the court's order, Commerce had to explain whether these assumptions were

supported by record evidence.

The agency did precisely that on remand.  First, it found no evidence to confirm that

merchandise sold in same contract or CONNUM bore a uniform chemical signature.  It observed

that the billet used to make OCTG for each contract came from a handful of suppliers.

Commerce also noted that tube sold in the same contract was made in multiple production runs

or "heats."  This suggested that pipe in a single contract could have different chemical properties.

*See* Remand Results 15.  Furthermore, as stated in response to the remand comments, none of the

CONNUMs used to identify unique tubular products included digits to represent chemical

composition.  Def.'s Resp. to Comments on Remand Redetermination 6 n.4, ECF No. 118.  So

even if merchandise in a single CONNUM was identical in some respects, the goods were not

necessarily identical in chemical makeup.  Of course, this evidence does not prove that each

contract and CONNUM contained both alloy and carbon goods.  But it shows there is no factual

basis to assume that goods in the same CONNUM or contract were chemically equivalent.

Commerce also deconstructed Plaintiffs' second assumption: that the mill reports

accurately represented the chemical traits of untested OCTG.  In general, for a sample to

represent the attributes of an object or objects, it must possess "the desired properties" of the

object, and be of sufficient quantity to be analyzed.  G. Kateman & L. Buydens, *Quality Control

in Analytical Chemistry* 18 (2d ed. 1993).  But as Commerce observed, the mill reports gave no

context or description of the procedures used to run the tests.  Remand Results 13−14.  It was

impossible to discern whether the mill tests took samples from all of, or just a fraction of, the

OCTG in a given contract.  Furthermore, judging from the first page of the reports, it seems

Chengde took only one sample per heat of OCTG produced.  Yet according to rules promulgated

by the International Organization for Standardization, the manufacturer must test two tubes per

heat to get a valid chemical reading.  *See id.* at 16; First Suppl. Resp. at S1-9.  With no outline of

the test procedures, and with no inkling of the number of tubes sampled, Commerce could not

decide whether the mill reports established the chemical properties of unsampled OCTG.  Thus

both assumptions supporting Plaintiffs' claim lacked a foundation in fact.

Beset with ambiguity, Commerce sensibly valued [[          ]] of Chengde's billet using a

simple average of the carbon and alloy steel surrogates.  The agency knew Chengde consumed

some carbon steel billet.  The mill certificates and CBP entry form proved as much.  Commerce

also knew that Chengde used some alloy steel billet.  Chengde's declaration in the initial

response and the company website supported that fact.  Because the agency lacked adequate data

to value the untested billet as all alloy or all carbon—and because it knew that Chengde used

both types of billet—the agency reasonably chose to value half of the unsampled billet as alloy

steel and half as carbon.  *See* Remand Results 13.  This Solomonic solution was based in

substantial evidence—far more than if Commerce had invoked Plaintiffs' baseless assumptions

to hold that the unsampled tube was carbon steel.

In rejoinder, Plaintiffs argue that Commerce asked only for sample mill certificates, not

certificates for every bundle of OCTG sold during the review period.  Because Commerce asked

for sample reports, Plaintiffs say it was wrong for the agency to refuse using sample data to value

the billet.  *See* Pls.' Cmts. 1−4.  But as it explained on remand, Commerce requested the sample

mill certificates to corroborate Chengde's U.S. sales data.  It did not ask for the certificates to

establish the chemical signature of the billet.  *See* Remand Results 18.  That was the purpose of

the first supplemental questionnaire, where Commerce asked for the "chemical specifications" of

the billet and for certificates of assay in support. *See* First Suppl. Q. at 6. Had Chengde wished

to prove that its billet was carbon steel, it could have answered these requests with exactness.

Instead, it regurgitated that its billet complied with ASME standards (which do not distinguish

between alloy and carbon steel), and withheld the certificates of assay that Commerce wanted.

*See* First Suppl. Resp. at Exs. S1-15 (S1-4), S1-16 (S1-5). Hence the agency used the OCTG

mill certificates as a secondary means of discerning the billet's chemical makeup. Commerce

never intended the certificates to establish the chemical composition of all the billet.

U.S. Steel's rebuttal fails too. As explained above, U.S. Steel insists that any billet not

specifically tested in the mill certificates was alloy steel. It bases its argument on Chengde's first

response that the billet was alloy metal. It also cites Chengde's failure to submit mill reports for

tube that later proved to be alloy. *See* U.S. Steel Cmts. 11−12. Had the untested tube been made

of carbon steel, U.S. Steel says Chengde would have provided proof to that end instead of

retaining mill reports as it did for contracts [[                              ]].

But the court's standard of review precludes this argument. For an agency decision to

gain the court's stamp of approval, that determination must be rooted in substantial evidence.

*See* 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v.

NLRB*, 305 U.S. 197, 229 (1938). Speculative claims that are plausible in theory but

unsupported in fact do not make the cut. *See Thai Plastic Bags Indus. Co. v. United States*, 37

CIT __, __, 904 F. Supp. 2d 1326, 1332 (2013) (citing *Lucent Techs., Inc. v. Gateway, Inc.*, 580

F.3d 1301, 1327 (Fed. Cir. 2009) ("It is well established that speculation does not constitute

substantial evidence.")).

U.S. Steel's argument is the very soul of speculation.  The defendant-intervenor posits

that all the billet was alloy steel because Chengde said it was so in its initial response.  But the

mill certificates and the CBP entry form decisively disprove this.  Furthermore, one cannot infer

from the failure to submit comprehensive mill reports that Chengde was hiding something.  It is

certainly *possible* that Chengde withheld select reports because they showed that the billet tested

was alloy.  But it is also possible that Chengde provided incomplete reports because it tested just

a few of its products.  Or maybe Chengde misplaced the missing certificates—another benign

possibility.  In short, one cannot infer from the patchwork record that Chengde withheld mill

reports to cut its dumping rate.[4]  A man is not a thief simply because he is wearing a trench coat.

After considering the parties' comments, the court sustains the decision to value the

untested billet using a simple average of the alloy and carbon steel surrogate prices.  Commerce

was working with an imperfect record, and the decision it rendered on remand dealt reasonably

with the evidence available.

## II.     Commerce Reasonably Determined the Surrogate Price for High Carbon Steel

The court now turns to the second contested issue: the agency's use of Indonesian

surrogate data to value high carbon steel.  In its previous opinion, the court granted Commerce's

request to reconsider its surrogates for high and low carbon steel.  *Am. Tubular Prods.*, 2014 WL

4977626, at *8−9.  Then on remand, the agency found that the surrogates were reasonable

compared to benchmarks from several developing countries.  *See* Remand Results 10−11.

Plaintiffs now argue that the high carbon steel surrogate was aberrational, even though it fell

among a range of third-country benchmarks.  To ensure the high carbon steel surrogate reflects

---

[4] U.S. Steel says the Chengde company website also shows that the untested tube was alloy steel.  U.S. Steel Cmts. 13.  The court disagrees.  The website established that pipe sold in contracts [[                    ]] was alloy steel, but it accomplished nothing beyond that.  *See Am. Tubular Prods.*, 2014 WL 4977626, at *6−7.

the best available information on the record, Plaintiffs say Commerce should use an Indonesian

value, but washed of import prices that exceed the simple average of five select benchmarks.  *See*

Pls.' Cmts. 16.  Otherwise, they ask the agency to use Ukrainian data, which they say contain no

aberrant values.

The court does not share the Plaintiffs' concerns.  While it is true that Commerce must

use only the "best available information" to make surrogates, the agency has discretion to decide

what the best information in the record is.  *See Nation Ford Chem. Co. v. United States*, 166 F.3d

1373, 1377 (Fed. Cir. 1999) (discussing 19 U.S.C. § 1677b(c)(1)).  In practice, Commerce often

chooses import data as the raw material for its surrogate values.  The information usually comes

from a single surrogate country with a market economy comparable to the subject country's.  *See*

19 C.F.R. § 351.408(c)(2).  After molding the data into a surrogate, Commerce can check to see

if the surrogate jibes with economic reality by comparing it to benchmarks from other markets.

If the surrogate falls far outside the range of benchmark prices, it may be unfit for use in the NV

formula, especially if it's based on small, unrepresentative import quantities.  *See Blue Field*

*(Sichuan) Food Indus. Co. v. United States*, 37 CIT __, __, 949 F. Supp. 2d 1311, 1326−27

(2013) (remanding rice straw surrogate that exceeded benchmarks by fifteen times); *Mittal Steel*

*Galati S.A. v. United States*, 31 CIT 1121, 1133−35, 502 F. Supp. 2d 1295, 1306−08 (2007)

(remanding surrogate from Philippines because surrogate was based on small import volume and

was ten times higher than other benchmarks); *Shanghai Foreign Trade Enters. Co. v. United*

*States*, 28 CIT 480, 492−96, 318 F. Supp. 2d 1339, 1351−53 (2004) (remanding surrogate from

India because surrogate was based on small import volume and was higher than other

benchmarks).  But if a surrogate places comfortably among the benchmarks, Commerce may

find that it is the best available information to value the input.

The agency reached the latter conclusion on remand, and reasonably so.  To ensure that its high carbon steel surrogate reflected the best available information on record, Commerce first deleted from the Indonesian surrogate value any import prices from nonmarket economies, from countries with generally available export subsidies, with zero quantity or price values and with high prices but low volumes.  This yielded a surrogate of $1149.40/MT.  Then Commerce compared the Indonesian surrogate value to third-country benchmarks, also scrubbed of import data from nonmarket economies, *et cetera*.  The comparison showed that the Indonesian surrogate was about two-hundred percent of the lowest benchmark (Thailand at $567.55/MT) and fifty percent of the highest benchmark (the Philippines at $2211.14/MT).  Because the surrogate fell between these bookends, Commerce concluded that the value was not aberrational. *See* Remand Results 11.  And based on its review of the record, the court agrees.  Even if the agency could have used other data to value high carbon billet, Commerce was within its discretion to use the Indonesian values as a surrogate.  *See Nation Ford*, 166 F.3d at 1377.

Plaintiffs still insist that the Indonesian surrogate was aberrant.  In the first of four arguments, they say the benchmark from the Philippines ($2211.14/MT) was itself aberrational, and hence ineligible to prove that the Indonesian price was reasonable.  They add that the five least expensive benchmarks (Colombia, Peru, South Africa, Thailand, and Ukraine) better reflect reality, and show that the Indonesian surrogate is too high.  Pls.' Cmts. 13−14, Ex. 3.  But Plaintiffs' technique begs the question.  Instead of offering independent reasons why the Indonesian and Philippines values are aberrant, they surmise that any price higher than the Indonesian price is distortive.  In essence, they assume the surrogate is aberrational in an attempt to prove that the surrogate is aberrational.  This logic is circular; it cannot prove that the values from Indonesia and the Philippines were deviant.

Furthermore, the Indonesian and Filipino values represent only 203% to 390% of the lowest benchmark (Thailand at $567.55/MT), and 124% to 239% of the benchmark just below Indonesia (South Africa at $926.16/MT). *See id.* at Ex. 3. The court has found disparities of this size to signal aberrations in the past, but those aberrational prices were usually based on tiny import volumes. *See Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 37 CIT __, __, 2013 WL 920276, at *4−6 (Mar. 11, 2013) (remanding surrogate that exceeded benchmarks by 200% to 400%, was based on import volume that equaled 0.047% of producer's consumption); *Shanghai Foreign Trade*, 28 CIT at 492−96, 318 F. Supp. 2d at 1351−53 (remanding surrogate that exceeded benchmarks by between 40% and 80% and was based on small import quantity). Here, Plaintiffs have not argued that the values from Indonesia and the Philippines were based on small import volumes. And the price differences, though sizeable, are not outlandish. *See Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 28 CIT 1185, 1200 (2004) (holding import price that was 8.5 times higher than average varied to a "uniquely extreme degree"). So even if the Indonesian and Filipino surrogates exceeded other benchmarks, this does not prove that the values were aberrant.

Second, Plaintiffs contend that the high carbon steel surrogate ($1149.40/MT) appears aberrational next to the low carbon steel surrogate ($556.64/MT). They also note that the low carbon Indonesian import prices are tightly clustered but the high carbon import prices are not. In their view, this means the high carbon surrogate must contain some aberrant values. *See* Pls.' Cmts. 9−10. But neither of these points discredits the high carbon surrogate. Though the high carbon surrogate exceeds its low carbon counterpart, Plaintiffs offer no extrinsic evidence that items in the HTS categories for high and low carbon steel sell for the same price. Even if the two types of steel are chemically similar, they may be manufactured or used in different ways

and command different prices.  Furthermore, the variation among import prices in either

subheading was largely the agency's own doing.  Before calculating the surrogates, Commerce

cleaned the datasets of aberrational import prices, or any price more than about four times the

price at the bottom of the dataset.  For low carbon steel, Commerce eliminated six import prices

as aberrational; for high carbon steel, it deleted one.  *See id.* at Exs. 1−2.  This left a tightly

clustered set of prices for low carbon steel, but a more variegated range for high carbon steel.

The differences between the variances, then, do not prove that the high carbon surrogate

contained aberrant import prices.  Instead it reflects the agency's judgment that prices below four

times the lowest import value were *not* aberrational—a judgment that the court finds to be

reasonable on this record.

Third, Plaintiffs argue that the high carbon steel price appears strangely when stacked

next to the alloy steel surrogate price ($1120.13/MT).  They claim that alloy steel is a higher

value product than carbon steel, and that the high carbon steel price should not exceed the alloy

steel price.  Pls.' Cmts. 10−11.  Yet Plaintiffs fail to back their position with firm evidence.  For

example, they offer no proof—other than their word alone—that alloy steel is more refined than

high carbon steel.  If it were, then perhaps the court would hold that the high carbon surrogate

was aberrational.  *See Blue Field*, 37 CIT at __, 949 F. Supp. 2d at 1326−27 (finding rice straw

surrogate aberrational because it exceeded price of rice grain); *Baroque Timber Indus.*

*(Zhongshan) Co. v. United States*, 37 CIT __, __, 925 F. Supp. 2d 1332, 1344−45 (2013)

(finding core veneer surrogate aberrational because it exceeded price of face veneer).  Plaintiffs

also fail to show that alloy steel prices always exceed high carbon steel prices.  They note that

the weighted average high and low carbon steel price ($813.86/MT) is less than the alloy price

here.  But even if the composite carbon price is lower than the alloy price, this does not mean

that high carbon steel, standing alone, must also be less expensive than alloy steel.

Finally, Plaintiffs argue that the high carbon surrogate was aberrant because it exceeded

weekly average prices on the London Metals Exchange ("LME") for high carbon steel.  They

admit that the LME price was unfit as a surrogate, yet they claim that the agency erred to reject

the LME prices as benchmarks.  *See* Pls.' Cmts. 11−12 (citing cases approving benchmarks that

were not appropriate as surrogates).  But Plaintiffs forget that the LME data comprised prices

from nonmarket economies and countries with generally available export subsidies.  The agency

usually purges these values from the import data to ensure its surrogates and benchmarks reflect

free market prices.  *See* Remand Results 22.  So if Commerce had compared the high carbon

surrogate to the LME prices, there was a risk that the surrogate would appear aberrant, even if it

was not.  The agency was right to exclude the LME prices as a benchmark for high carbon steel.

In sum, Plaintiffs have not shown that the Indonesian high carbon steel surrogate was

aberrational.  So even if there were other viable high carbon surrogate on the record, Commerce

properly exercised its discretion to choose the value it thought best.  *See Nation Ford*, 166 F.3d

at 1377.  The court sustains both the high carbon and low carbon steel surrogate values as

substantiated in evidence and otherwise in accordance with law.

## CONCLUSION

The decisions in the Remand Results are sustained.  Judgment will enter accordingly.


/s/ Richard W. Goldberg
Richard W. Goldberg
Senior Judge


Dated:  August 28, 2015
         New York, New York